# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

JILL ROE, COREY ROBINSON,
and IRIS CAWTHORN                                        PLAINTIFFS


v.                           Case No. 2:09-cv-98–DPM


ELMER GRAHAM, in his official and                       DEFENDANT
individual capacities


## MEMORANDUM OPINION AND ORDER

This case involves three Plaintiffs, three arrests, and lots of claims. The

tie that binds Jill Roe, Corey Robinson, and Iris Cawthorn is that they were

arrested by a Des Arc police officer named Elmer Graham at different times

in 2007 and 2008. Those arrests have prompted claims alleging (among other

things) excessive force and an unlawful arrest based on nothing more than a

mother's speech. The parties tried their case to the Court on 19 October 2010.

They agree that this Court has personal jurisdiction over them and subject

matter jurisdiction over all their claims. Venue is proper too. A chart at the

end of this opinion catalogs the final disposition of all the claims in the case.

For various reasons that will be made clear in this opinion, Officer Graham is

entitled to judgment.

# I.

Before discussing the merits, the Court must resolve a pending motion for judgment on partial findings that Officer Graham made at the close of the Plaintiffs' case and again after his case. FED. R. CIV. P. 52(c). During Officer Graham's first motion—and Plaintiffs' response to it—the parties agreed that the Court should dismiss some claims based on the record at that point. These claims were dismissed:

- *Jill Roe's unlawful-arrest claim (official and individual capacity)*: Roe's section 1983 claim against Officer Graham based on an unlawful arrest was dismissed based on her still-valid conviction for hindering apprehension and *Heck v. Humphrey*, 512 U.S. 477 (1994). The Court clarifies now that this dismissal is without prejudice.

- *Corey Robinson's unlawful-arrest claim (official and individual capacity)*: Robinson's section 1983 claim based on an unlawful arrest was dismissed with prejudice at trial by agreement based on the unchallenged arrest warrant for unpaid child support.

- *Punitive-damages claims (official capacity)*: Plaintiffs' federal claims for punitive damages against Officer Graham in his official capacity were dismissed with prejudice to the extent they were pleaded.

- *Des Arc's policy or custom on unlawful use of force*: Roe and Robinson conceded that they had insufficient proof to support a direct claim against the City of Des Arc, Arkansas, under federal law. The Court dismissed these

claims with prejudice.

Notwithstanding this paring down, some claims remain the target of Officer Graham's motion under Rule 52(c), which the Court kept under advisement at the end of the case and now decides.

1.     As to Cawthorn, the Court grants the Rule 52(c) motion in part and denies it in part. She was convicted of refusing to submit to arrest and that conviction remains valid. The Court agrees with Officer Graham that *Heck v. Humphrey* holds that Cawthorn may not pursue a section 1983 claim for unlawful arrest unless she first has that state-court conviction "reversed on direct appeal, expunged by an executive order, declared invalid by a state tribunal authorized to make [that] determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck*, 512 U.S. at 486–87, 489. None of these things have been done on the conviction for refusing to submit to arrest. The Court therefore dismisses without prejudice Cawthorn's section 1983 claim based on an unlawful arrest. *Schafer v. Moore*, 46 F.3d 43, 45 (8th Cir. 1995) (a *Heck*-based dismissal is without prejudice). *Heck* does not reach Cawthorn's section 1983 claim for excessive force. And the Court declines to apply *Heck* to Cawthorn's state-law claim under the

Arkansas Constitution and the Arkansas Civil Rights act in the absence of Arkansas precedent.

2.    Officer Graham also argued that all the punitive-damages claims against him (in any capacity) failed on the proof.  Plaintiffs conceded that punitive damages were not available on any official-capacity claim under federal law.  Having considered all the testimony and documentary evidence at trial, the Court agrees that an insufficient evidentiary basis exists to consider awarding punitive damages to Cawthorn, Roe, or Robinson on any federal claim against Officer Graham.  Their punitive-damages claims are therefore dismissed with prejudice.  For the reasons discussed later in this opinion, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state-law claims, including those seeking punitive damages.

Officer Graham's motion for judgment on partial findings is otherwise denied.

## II.

### Iris Cawthorn's Arrest

**Findings of Fact**

1.      Elmer Graham was an officer with the Des Arc, Arkansas, Police Department when he arrested Iris Cawthorn in November 2007. He has been a certified law-enforcement officer since 1995 and has had continuing law-enforcement training since he completed the basic-training course. Officer Graham has been trained in the proper use of force and when to use it.

2.      Officer Graham lawfully arrested Cawthorn's son, Robert "Sonny" Cawthorn, one day in November 2007. Officer Graham then drove Robert to the Prairie County Sheriff's Office for processing.

3.      Cawthorn knew her son was going to be arrested based on a phone call he had made to her shortly before his arrest. Cawthorn was not surprised that her son had been arrested because she knew about an outstanding warrant against him. She arrived at the Sheriff's Office a short time after her son and Officer Graham got there. She went to the station to check on her son, who sometimes has trouble breathing and requires an inhaler.

**4.**     Officer Graham had yet to transfer Robert from his car and into the jail when Cawthorn approached them.  They all met in the parking lot, which was open to the public. The testimony conflicted on what exactly Cawthorn said to Officer Graham and how she said it.  But the Court need not resolve this conflict.

**5.**     What is clear is that Officer Graham told Cawthorn that he could not help her and that she should see a local District Judge about the arrest warrant.  He  also told her to leave so that he could process her son into the jail.  Cawthorn complied.

**6.**     While driving away, Cawthorn saw an ambulance heading to the Sheriff's Office.  She became concerned that the emergency personnel had been called to treat her son's breathing problems.  She turned the car around and drove back to the Sheriff's Office.

**7.**     The parties agreed at trial that Cawthorn's claims turn on her second trip to the Sheriff's Office.    The Court agrees, and therefore concentrates on that event.

**8.**     Cawthorn went inside the Sheriff's Office and asked to speak with Officer Graham again.   She began asking loudly about her son  and

-6-

complaining about his arrest. Cawthorn was causing a disturbance, so some personnel asked Officer Graham to go up front and talk to her. At this point, Officer Graham was in the back of the jail working on the paperwork to complete Robert's arrest. Having to deal with the disturbance interfered with Officer Graham's duty to process Robert's arrest.

9.    The front door of the Prairie County Sheriff's office opens into a small, hall-like lobby, approximately eight feet wide and ten feet long. The lobby contains a few chairs. There is a counter beneath a plexiglass window in a wall that separates the lobby from the dispatch area. Visitors can talk with the office staff through the window. The dispatch area includes the dispatcher's work station and desks for officers. A door provides access from the lobby to the dispatch area. The lobby is a public space routinely used by citizens.

10.    The particulars of Cawthorn's demeanor and behavior in the lobby were much disputed. But the Court credits Officer Graham's testimony that Cawthorn was disrupting the staff's ability to work in the dispatch area. The dispatcher, a hesitant witness, wobbled on this issue depending on who was doing the questioning; so the Court gives little weight to her testimony.

-7-

Deputy Bradley Taylor was working in that area when Cawthorn was in the lobby. He heard the disturbance but not exactly what was said. The Court also credits Deputy Taylor's testimony that Cawthorn's behavior impaired the dispatcher's ability to handle calls effectively and eventually interrupted Deputy Taylor's own work.

11.   Officer Graham testified that Cawthorn was getting angry and becoming more belligerent while talking with him about her son. Officer Graham also said that he did not think he could de-escalate the situation, so he told her to leave. He said that by this time Cawthorn was right below raging and would not leave after she was told twice to do so.

12.   No other member of the public besides Cawthorn was in the lobby during the disturbance. She never acted violently, damaged any property, threatened anyone, approached anyone aggressively, or cursed any person. Officer Graham nonetheless warned Cawthorn that if she did not leave and end the disturbance she was causing then she would be arrested. Cawthorn refused to comply with the warning, so Officer Graham told her that she was under arrest.

13.    Officer Graham placed his hands on Cawthorn's hand to make the arrest.   According to her testimony, which was corroborated by Officer Graham, Cawthorn twisted out of his hands.   Officer Graham then put one arm around her shoulder, with one hand on the nape of her neck, and embraced her against the counter with his body.   He told her again that she was under arrest.

14.    Officer Graham also told Cawthorn that if she did not submit to arrest, then he would pepper spray her.   Cawthorn submitted.   Officer Graham testified that he took Cawthorn's size, age, and physical condition into account when deciding how much force to use when he arrested her.   The Court credits his testimony.   Though he threatened its use, Officer Graham never pepper sprayed Cawthorn; nor was she handcuffed during or after the arrest.

15.    After Cawthorn was arrested by Officer Graham, Deputy Taylor helped calm her down and escorted her to a holding area where her son was being held.  Cawthorn was detained a short period of time and then released. Deputy Taylor described Cawthorn as harassing Officer Graham in a report Taylor wrote after the arrest.

**16.**   Cawthorn never complained of any injury to Deputy Taylor, Officer Graham, or any other person at the Sheriff's Office. She did not tell Officer Graham that he was hurting her during the arrest. She did not cry out in pain or ask Officer Graham to stop hurting her.

**17.**   Cawthorn was not immediately treated by any health-care provider for any injuries—physical or psychological—that were allegedly caused by Officer Graham. About eight months after the arrest, Cawthorn had an MRI done on her neck and back. She agreed that she had problems with these areas before the arrest, though she said the arrest made those problems worse. Cawthorn agreed that she lost no income due to the arrest; but she was embarrassed by it, and she reduced her visits to town afterward. She also testified that the arrest made her long-standing depression worse and that she cried for weeks afterward.

**18.**   Cawthorn was charged with disorderly conduct and refusing to submit to arrest, and then convicted of both in a state District Court. She appealed her convictions to a state Circuit Court, which upheld the refusal-to-submit conviction and overturned the disorderly conduct conviction.

**19.**     Sometime after her arrest, Cawthorn complained about her arrest to the City of Des Arc Police Department.  Cawthorn also tried to file criminal battery charges against  Officer Graham.   No prosecutor pursued these charges.

**20.**     Des Arc Chief of Police Darrell Turner testified that he turned the investigation about the arrest over to the Prairie County Sheriff's Office. Sheriff Gary Burnett investigated Cawthorn's complaint.

**21.**     When Cawthorn was arrested, Des Arc had in place no policies or customs requiring or permitting officers to use more force than necessary to make an arrest.  The documentary evidence supports this fact.

**22.**     No reviewing official or entity found that Officer Graham violated Des Arc's written policy on the use of force.   Officer Graham was never disciplined by any supervising authority for how he treated Cawthorn.

**23.**     Based on the proof, the Court is not persuaded that the City was deliberately indifferent to Cawthorn's complaint of excessive force.   The Mayor received Cawthorn's complaint and Chief Turner referred it to the Prairie County Sheriff's Office for investigation by a third party.   That no disciplinary action was taken against Officer Graham is not necessarily proof

of deliberate indifference or a policy that condones (tacitly or otherwise) the use of excessive force. More is required.

24. No proof supports the allegation that Des Arc failed to train Officer Graham on constitutional standards or inadequately supervised him. The documentary evidence shows, instead, that Officer Graham received more than six hundred hours of training—in many subject areas, including use of force—over a fourteen-year period. Further, no testimony at trial cast any meaningful doubt on Officer Graham's training or the way in which he was supervised.

**Conclusions of Law**

25. The Court has already dismissed Cawthorn's federal unlawful-arrest claim without prejudice based on *Heck v. Humphrey*. Having considered her section 1983 claim that Officer Graham used excessive force during the arrest, the Court concludes that the claim fails on the proof.

26. Officer Graham did not use excessive force when he arrested Cawthorn. The Fourth Amendment's reasonableness test applies to excessive-force claims. *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009). "To establish a constitutional violation under the Fourth Amendment's

right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (internal quotation omitted). The reasonableness of the force is viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid*. Here, Officer Graham acted in an objectively reasonable manner in the circumstances the Court has already discussed. The law on point also asks whether and to what extent Cawthorn was injured during the arrest. Cawthorn did not persuade the Court that she was injured during the arrest. This conclusion also undermines her section 1983 claim. *E.g.*, *Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir. 2006) (collecting cases on excessive-force injuries).

27.     Cawthorn failed to present sufficient evidence to establish a right to recover under section 1983 for a failure to train or a failure to supervise. She also failed to prove that Des Arc had in place any policy or custom permitting officers to use excessive force to make an arrest.

28.     Now to Cawthorn's free-speech claim based on the First Amendment to the United States Constitution. The question is a close one, the hard issue in this case. The Court concludes that Cawthorn's section 1983

claim based on the First Amendment fails on the record presented.

29.     Cawthorn's right to speak her mind to public servants like Officer Graham about her son's arrest, and much else, is broad. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Texas v. Hill*, 482 U.S. 451, 462–63 (1987); *see also Gainor v. Rogers*, 973 F.2d 1379, 1387 (8th Cir. 1992). The Eighth Circuit has recently been clear that merely raising one's voice, pointing, and cursing a law-enforcement officer — if done at some distance and while approaching in a "non-aggressive manner" — are protected expressive acts. *Copeland v. Locke*, 613 F.3d 875, 879–80 (8th Cir. 2010). "It is . . . fundamental that a lawful arrest may not ensue where the arrestee is merely exercising [her] First Amendment rights." *Copeland*, 613 F.3d at 880 (internal quotation omitted).

30.     The Eighth Circuit has also held that "[t]o prevail in an action for First Amendment retaliation, [Cawthorn] must show a causal connection between [Officer Graham's] retaliatory animus and [Cawthorn's] subsequent injury." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010)

-14-

(internal quotation omitted). Cawthorn must also show that retaliation was "a substantial factor in the decision to arrest." *Ibid.* (internal quotation omitted). And she "must show that the retaliatory motive was a but-for cause of the arrest," meaning that Officer Graham "singled out" Cawthorn because she chose to express her opinions. *Ibid.* (internal quotations omitted). The Court is not convinced that Officer Graham arrested Cawthorn because of what she was saying. Nor is the Court convinced that retaliation was a substantial factor in the arrest. Officer Graham testified that he did not arrest Cawthorn based on what she said to him or because of their stand-off earlier that day. Had Officer Graham been grinding an axe when he arrested Cawthorn, then he would have acted unlawfully: "[P]olice officers . . . may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Nichols v. Chacon*, 110 F. Supp. 2d 1099, 1107 (W.D. Ark. 2000).

**31.**   Cawthorn was arrested because her loud and escalating behavior disrupted police work at the Sheriff's Office. Considering the record as a whole, the Court concludes that this was more than an interruption of police activities by an angry citizen. That situation is routine; and law-enforcement

-15-

officers must respond to it with great patience informed by a healthy respect for the First Amendment. Officer Graham's efforts to reason with Cawthorn, calm her down, or persuade her to leave the lobby failed. Rather than simmering down, the situation heated up.

**32.** Officer Graham was on firm ground when he determined that he had probable cause to arrest Cawthorn under Arkansas's disorderly conduct statute. Cawthorn makes no constitutional challenge to the statute's validity. *Compare City of Houston, supra.* That statute provides in part:

> (a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:
>
> * * *
>
> (2) Makes unreasonable or excessive noise[.]

Ark. Code Ann. § 5-71-207 (Supp. 2009). Keeping in mind that the concept is fluid, the Court concludes that Officer Graham had probable cause to arrest Cawthorn under subsection (a)(2) of the disorderly conduct statute.[*]

---

[*]The Court does not know which part of the disorderly conduct statute Officer Graham relied upon. Neither the police department nor the state District Court records identify a subsection. As long as Officer Graham had probable cause to arrest under any part of the statute, however, it does not matter in law that a specific subsection was not identified.

33.    Context is critical.   Unlike *Locke*—which involved a Missouri statute with different terms—this event occurred indoors and within the small public space adjoining the communication/operation center of the Prairie County Sheriff's Office.   The Court's probable-cause analysis is particularly informed by Officer Graham's testimony that he could not calm Cawthorn down and that she was in a near rage.   Arkansas police officers may consider a person's demeanor in deciding whether to arrest under the statute.  *Watkins v. State*, 2010 Ark. App. 85, at 2–6, 8–10, 2010 WL 305312, at 2, 4–5.   Officer Graham did so, and decided in light of all the circumstances that he had probable cause to arrest her.   The Court agrees.   Cawthorn's federal free-speech claim therefore fails because she must establish, among other things, that Officer Graham lacked probable cause to arrest her.  *McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010).

34.    Cawthorn also claims that Officer Graham violated her rights under the Arkansas Constitution and the Arkansas Civil Rights Act.   She argues from her right to protest—to remonstrate—inside the Sheriff's Office about how her son was being treated, contending that this is protected speech under the Arkansas Constitution.   Article 2, Section 4 states: "The right of the

people peaceably to assemble, to consult for the common good; and to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged."  Cawthorn seeks to vindicate this right through the liability provision of the Arkansas Civil Rights Act.  Ark. Code Ann. § 16-123-105 (Repl. 2006).

**35.**    Her remonstration claim is akin to a retaliation claim under the First Amendment to the Federal Constitution.  Cawthorn argued during the Rule 52(c) motions, however, that the Arkansas Constitution may provide more protection to her speech than the Federal Constitution.  She is correct. *E.g., State v. Brown,* 356 Ark. 460, 466–70, 156 S.W.3d 722, 727–29 (2004); *Scott v. State,* 347 Ark. 767, 784–88, 67 S.W.3d 567, 579–82 (2002) (Hannah & Thornton, J.J., concurring).  But in the circumstances presented, the Court declines to decide Cawthorn's speech claim under state law.  To do so, this Court would have to predict how the Arkansas Supreme Court would hold on at least two issues:  what does the right to remonstrate mean?  And how does that right apply in a law-enforcement context?  These important and complex legal questions have not been squarely addressed by an Arkansas

appellate court.** This fact cuts against the Court exercising supplemental jurisdiction. 28 U.S.C.A. § 1367(c)(1) (West 2006). Second, the Court has decided against Cawthorn on all her federal claims. This fact also counsels against deciding a supplemental state-law claim. 28 U.S.C.A. § 1367(c)(3). The Court concludes that the more prudent course is to dismiss Cawthorn's free-speech claim under state law without prejudice. *Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) (District Courts have discretion to decline exercising supplemental jurisdiction); *McLaurin v. Prater*, 30 F.3d 982, 984–85 (8th Cir. 1994) (District Court should exercise jurisdiction unless it finds that subsection (c)'s factors counsel against doing so).

36.     In summary, based on the testimony, documentary evidence, and the law, Cawthorn has not established any violation of federal law. All her federal claims — except the unlawful-arrest claim the Court dismissed based on *Heck* — are dismissed with prejudice. All her state-law claims are dismissed without prejudice.

---

**The Arkansas Supreme Court recently avoided deciding the merits of a free-speech claim under state law for lack of a comprehensive written argument on point. *Walters v. Dobbins*, 2010 Ark. 260, 2010 WL 2131869. Cawthorn has not fully briefed her state-law speech claim. A District Court should not decide such a claim without full briefing and ensuring it is prudent to exercise supplemental jurisdiction over an important state-law issue.

## III.

## Jill Roe's and Corey Robinson's Arrests

### Findings of Fact

1.      In May 2008, Officer Graham was called to assist Deputy Sheriff Glenn Holmes execute an arrest warrant on Corey Robinson at a home in Des Arc.  Robinson was living there with Jill Roe and her father, Bruce Roe, who owned the home.

2.      Deputy Holmes knew where to find Robinson because Des Arc Police Chief Darrell Turner lived across the street and told Graham that he had seen Robinson outside the house.  Chief Turner knew there was an active arrest warrant for Robinson, saw some of the events related to his arrest, and participated collaterally in it.

3.      Deputy Holmes saw Robinson outside the Roe home when he drove by in a patrol car.  He confronted Robinson at the front of the house and told him he was under arrest based on a warrant issued from Pope County, Arkansas.   The warrant was based on Robinson's failure to pay about $53,000.00 in child support.

4.      Robinson went inside the house after Deputy Holmes told him

that he was there to arrest him.  When Chief Turner saw Robinson enter the house, he thought Robinson might flee and ordered Officer Graham to go to the side of the Roe home.

5.      Officer Graham had arrested Robinson before, without incident, on warrants for unpaid child support. Officer Graham testified, however, that Robinson sometimes gets very upset and is unpredictable.

6.      As Officer Graham approached the side of the house, in what the witnesses described as essentially an alley, Jill Roe opened the side door. According to Officer Graham, whose testimony the Court credits, Roe looked out the side door — as if to see whether the coast was clear.  Roe testified that she saw a police car approaching the side of the house.

7.      Officer Graham asked Roe where Robinson was located; she replied that she had last seen Robinson outside the front of the house.  As he was talking with Roe, however, Officer Graham could see part of Robinson's body behind her.  Officer Graham warned Roe that hiding Robinson was a crime. The Court credits Roe's testimony that she did not know that Robinson had come in the house and was standing behind her at that point.

8.      After he saw Robinson, Officer Graham pushed past Roe, entered

the house, confronted Robinson, and placed one handcuff on him. But Officer Graham could not get the second handcuff on because Robinson began to resist arrest. Robinson testified that he held one arm out towards Officer Graham in a non-threatening manner as if to surrender to arrest. The Court credits all this testimony: Robinson started submitting to arrest, and then began resisting.

9.     A scuffle ensued. Officer Graham and Robinson struggled inside a small room in the Roe home. A ladder, a table, and other items were knocked over during the tussle. Officer Graham characterized Robinson as quick and pretty strong. At some point, Robinson's head went through a sheetrock wall. Robinson testified that this "sort of hurt" and that Officer Graham otherwise roughed him up some. There was no testimony that Officer Graham intentionally caused Robinson's head to go through the wall. Robinson's demeanor when testifying about this point was calm, even nonchalant.

10.     Robinson neither requested nor received medical care at the Roe home. Robinson stated that he sought treatment at the jail, but no documentary proof supported his contention.

**11.**     During the tussle between Officer Graham and Robinson, Jill Roe and Bruce Roe were either inside the small room or at the doorway. The Roes were approximately six feet behind Officer Graham when he was trying to handcuff Robinson. Officer Graham reenacted at trial how he and Robinson were positioned during the scuffle. The Court credits the reenactment.

**12.**     Officer Graham told the Roes to get back and leave the room; neither Jill nor Bruce Roe—a retired deputy sheriff—followed the order. Officer Graham said at trial that he felt his gun-belt getting bumped as he was bent over trying to handcuff Robinson. Jill Roe said that she never touched his gun-belt. Bill Roe—an older gentleman battling cancer when the arrests occurred in May 2008—died before trial. No prior written statements by him were offered. There was no testimony that Robinson ever tried to touch or get Officer Graham's gun. Perhaps the falling ladder or paint cans bumped the gun-belt. It does not matter. Officer Graham was carrying a weapon, which—in this small room—was readily accessible to Robinson and the Roes had one of them wanted to reach for it.

**13.**     Officer Graham said at trial that he was very scared during the arrest at the Roe home. Concerned for his safety, the Court believes, but very

scared is a stretch.  Because the Roes refused to comply with his verbal commands, and because Officer Graham was concerned for his safety, he turned and shot some pepper spray in the Roes' direction.  Turning away from Robinson during the arrest created a risk of harm to Officer Graham because Robinson had a dangling handcuff that he could have (but did not) use as a weapon against Officer Graham.

14.     After the first spray Jill Roe stepped towards Officer Graham.  Just how much closer she came to Officer Graham was disputed.  But the Court is persuaded that an arresting officer could have reasonably believed that Roe presented a threat to his safety in the circumstances.  Officer Graham then shot another burst in Jill Roe's direction, some of which she shielded from her face with a raised arm.  The pepper spray caused the Roes to leave the room. Jill Roe admitted that she could have left the six-by-ten room at anytime but did so only after she was sprayed.

15.     Officer Graham eventually completed Robinson's arrest by placing the second handcuff on him, getting him outside, and taking him to the Prairie County Sheriff's Office with Deputy Holmes's help.  Jill Roe was also taken to the Sheriff's Office by the two officers.

-24-

16.     Robinson did not complain to Officer Graham at the scene of any injuries.  Robinson did not state in his complaint that he was pepper sprayed by Officer Graham.  At trial, however, Robinson complained of being sprayed. Robinson probably did get some residual spray in his face but nothing more. Officer Graham said that he got some spray on himself too.

17.     Officer Graham's training included training on the use of pepper spray.  Pepper spray is an effective method to gain a person's compliance without causing any adverse, long-term physical harm.  A person may deactivate or dilute pepper spray's effect by rubbing a wet rag over his or her eyes or flushing them with water.

18.     Robinson sustained no real injury during the arrest.  Robinson admitted, for example, that he received no bruises; and he otherwise put on no proof of any physical injury.  While having one's head go through a sheetrock wall must have hurt, based on Robinson's words and demeanor describing what happened, the Court concludes that this event sounds worse than it was and that Robinson sustained no more than a passing *de minimis* injury from it.

19.     Robinson was charged with resisting arrest and was convicted of

the lesser included crime of refusing to submit to arrest in a state District Court. The conviction was not overturned. Jill Roe was charged and convicted of hindering apprehension. The conviction was not overturned. Jill Roe was not injured by the pepper spray—the discomfort was temporary. Though the testimony was not entirely clear on the point, it seems that Roe was permitted to wash her eyes while still at home and again at the Sheriff's Office.

 **20.** Officer Graham made the arrests at the Roe home under tense circumstances that happened quickly. Neither Jill Roe nor Corey Robinson complained to a supervising official about their arrests. Officer Graham was not disciplined for using excessive force in this arrest. He has never been disciplined for using excessive force while employed as a law-enforcement officer for Des Arc.

### Conclusions of Law

 **21.** Roe and Robinson sued Officer Graham in an official and individual capacity.

 **22.** The City of Des Arc, Arkansas, was not a named defendant; but a claim against Officer Graham in his official capacity is a claim against the

City. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). On their official-capacity claim alleging that the city maintains or condones law enforcement's excessive use of force, Roe and Robinson must show that Des Arc had a policy or custom that violated a protected right. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Roe and Robinson conceded at trial that they do not have sufficient proof to make such a claim. The Court agreed and dismissed their claims.

23.    A reasonable officer in Officer Graham's place when he made the May 2008 arrests would not conclude that Roe's or Robinson's rights under the federal Constitution were violated.

24.    Because it was pleaded in the complaint and mentioned at trial, the Court will briefly address Officer Graham's entry into the Roe home without a warrant authorizing that entry. No party disputed that the officers had a valid arrest warrant for Robinson based on his failure to pay child support. It was also undisputed that Deputy Holmes appeared outside the Roe home and engaged Robinson to arrest him based on the warrant. Due to hearsay problems, the record is murky on why Robinson went inside the house after being contacted outside the house—maybe he had Deputy Holmes's permission to do so, maybe not. Deputy Holmes did not testify.

The Court is inclined to infer that Robinson had permission, which would have been contrary to sound police practice. But the Court need not decide the permission issue. This hole in the proof is not material given the unchallenged arrest warrant for Robinson and that he resided in the Roe home when he was arrested in it.

25.    Under Eighth Circuit precedent, the officers on the scene were permitted to enter the Roe home and arrest Robinson based on the child-support warrant that no party has challenged. The entry was constitutionally permissible because Robinson—who has a committed relationship with Jill Roe—had resided in the Roe home for about five months when he was arrested. *United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010); *United States v. McIntosh*, 857 F.2d 466, 469 (8th Cir. 1988).

26.    Once lawfully inside the home, the officers could arrest Jill Roe if probable cause to do so arose. It did. A warrantless arrest implicates the Fourth Amendment. But "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Baribeau*, 596 F.3d at 474 (internal quotation omitted). Probable cause exists

when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

27.   Officer Graham had probable cause to arrest Robinson based on the unchallenged arrest warrant.   Robinson's counsel conceded this legal point at trial.   Counsel did not concede that entry into the home was lawful. But the law is simply against Roe and Robinson on any unlawful-entry claim. Officer Graham also had probable cause  to arrest Jill Roe.   In reaching this conclusion, the Court has leaned on the fact that Roe was convicted in District Court for hindering apprehension.   She never challenged that state-court conviction.

28.   Officer Graham did not use excessive force when he arrested Robinson. The Fourth Amendment's reasonableness test applies to excessive-force claims. *Brown*, 574 F.3d at 496. "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the

particular circumstances." *Ibid.* (internal quotation omitted). The reasonableness of the force is viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.*

29.    In the circumstances presented, Officer Graham acted in an objectively reasonable manner. An important part of the Court's analysis here is Officer Graham's familiarity with Robinson from prior arrests. The law on point also looks at whether, and to what extent, Robinson was injured during the arrest. Any injury, the Court is convinced, was nonexistent or *de minimis*, too slight by the governing federal constitutional standard to support his section 1983 claim. *Wertish*, 433 F.3d at 1066–67 (*de minimis* injuries support the conclusion that force used was not excessive).

30.    Officer Graham did not use excessive force when he arrested Roe either. As to her, Officer Graham acted in an objectively reasonable manner under the circumstances presented. *Ibid.* Moreover, it is important that Roe made no case for any injury except for the temporary burning sensation from the pepper spray. The use of pepper spray is not always permissible. *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002). But Officer Graham's decision to use it in this case was lawful, partly because he used it reasonably.

31.    Having considered all the testimony, documentary evidence, and the law, the Court concludes that Jill Roe's and Corey Robinson's section 1983 claims based on the excessive use of force fail on the merits.  Further, no evidence was admitted to establish any failure-to-train or failure-to-supervise claim.  These claims fail on the merits too.  All their claims having failed, neither Robinson nor Roe is entitled to any damages.

32.    Officer Graham raised the qualified-immunity defense at trial. Because the Court has determined that he had "actual probable cause" to arrest Roe and Robinson, it need not decide "whether qualified immunity shields" him.  *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 818 (8th Cir. 2010).

33.    The Court declines to exercise supplemental jurisdiction over any state-law claim Roe or Robinson asserted for the reasons discussed as to Cawthorn.  The state-law claims are dismissed without prejudice.

* * *

For the reasons given, all of Cawthorn's, Roe's, and Robinson's claims are dismissed either with or without prejudice.  The attached chart summarizes the Court's rulings on each.

So Ordered.

D.P. Marshall Jr.
United States District Judge

_23 November 2010_

| Iris Cawthorn | Jill Roe | Corey Robinson |
|---|---|---|
| *Any claim for any damages under state law* against Officer Graham in any capacity is dismissed without prejudice. | *Any claim  for any damages under state law* against Officer Graham in any capacity is dismissed without prejudice. | *Any claim for any damages under state law* against Officer Graham in any capacity is dismissed without prejudice. |
| *Unlawful-arrest claim under section 1983* against Officer Graham in any  capacity is dismissed without prejudice. | *Unlawful-arrest claim under section 1983* against Officer Graham in any capacity is dismissed without prejudice. | *Unlawful-arrest claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. |
| *Excessive-force claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. | *Excessive-force claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. | *Excessive-force claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. |
| *Failure to train or supervise claim under section 1983* is dismissed with prejudice. | *Failure to train or supervise claim under section 1983* is dismissed with prejudice. | *Failure to train or supervise claim under section 1983* is dismissed with prejudice. |
| *Punitive-damages claim based on any section 1983 claim* against Officer Graham in any capacity is dismissed with prejudice. | *Punitive-damage claim based on any section 1983* against Officer Graham in any capacity is dismissed with prejudice. | *Punitive-damage claim based on any section 1983* against Officer Graham in any capacity is dismissed with prejudice. |
| *First Amendment claim under section 1983* is dismissed with prejudice. | *Unlawful-entry claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. | *Unlawful-entry claim under section 1983* against Officer Graham in any capacity is dismissed with prejudice. |
| *Policy or custom claim against Des Arc under section 1983* is dismissed with prejudice. | *Policy or custom claim against Des Arc under section 1983* is dismissed with prejudice. | *Policy or custom claim against Des Arc under section 1983* is dismissed with prejudice. |